IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRIS LUSBY TAYLOR, et al.,

      Plaintiffs,               No. CIV S-01-2407 JAM GGH

     vs.

JOHN CHAING, et al.,            FINDINGS & RECOMMENDATIONS

      Defendants.

_____/

*Introduction and Summary*

      "Plaintiffs seek a total adjusted award of **$5,449,826.72** for their *interim* fees and expenses incurred to date."  Plaintiffs' Reply Memorandum...Interim Fee Award (filed December 12, 2008) at 11.  If granted, the "interim" fees award would constitute one of the highest fee awards ever awarded by this district.  In light of Ninth Circuit precedent which requires a reasoned explanation for the award of fees, substantial work must be put into these Findings and Recommendations.

      The overarching defect in plaintiffs' interim fees application is the number of hours claimed.  Plaintiffs' attorneys seek recompense for over 7,000 hours, *thus far in the litigation*, not counting paralegal hours.  In contrast, defendants' total hours expended thus far total a little over 2,000.  Johansen Decl., docket # 200, ¶ 3.  There is simply no justifiable reason

1

for this 5000 hour discrepancy except for the excessive, at times grossly excessive, over billing

by plaintiffs.[1]

*Chronology of the Case*

The chronology of the case through remand to this court for calculation of interim

attorneys' fees is well set forth in the Ninth Circuit opinion, Taylor v. Westley/Chiang, 525 F.3d

1288, 1289 (9th Cir. 2008).  It is repeated here because the context of the proceeding is important

to understand in determining the reasonableness of fees.

> This controversy has been the subject of extensive litigation in the district court
> and has generated two prior appeals. In both the prior appeals, plaintiffs prevailed.
> In the first appeal, we determined that the State of California did not have the
> sovereign immunity that it claimed.  See Taylor v. Westly (Taylor I), 402 F.3d
> 924, 936 (9th Cir. 2005).  In the second appeal, we concluded that the State's
> procedures for protecting the rights of owners of property in its escheat process
> were unconstitutional.  See Taylor v. Westly (Taylor II), 488 F.3d 1197, 1201-02
> (9th Cir.2007).  We required the district court to enjoin operation of the California
> escheat process and suggested that the district court require court approval of
> curative regulations.  See id. at 1202.
>
> After the plaintiffs had won these two victories on appeal, the district court issued
> a preliminary injunction pursuant to our mandate.  The State then eliminated the
> statutory and administrative procedure that we had determined to be
> unconstitutional.  The State promulgated an entirely new statutory procedure
> addressing escheat. See Cal.Code Civ. P. § 1501.5(c) (West 2008); see also id. at
> §§ 1531, 1531.5, 1532, 1563, 1565.  Concluding that the amendments remedied
> the constitutional defects we identified in Taylor II, the district court granted the
> Controller's motion to dissolve the injunction.

In its most recent decision, May 12, 2008, the Ninth Circuit determined that the

district court was correct in dissolving the injunction when defendants' procedures  had been

legislatively/administratively rectified to comport with due process, although the Ninth Circuit

stated that its opinion in this matter was preliminary.  With the specter of further proceedings in

the district court, the Ninth Circuit directed the district court to award interim attorneys' fees:

> The discrete stage of this litigation that plaintiffs won is over, because of the
> permanent change in the law that plaintiffs forced upon the State of California

---

[1]  While the court would expect plaintiffs' counsel to incur more time than defendants'
counsel in the initial investigatory stages of representation, this extra time in no way accounts for
the gross disparity of time spent in the case.

2

through the appeals and consequent injunction.  Because of the magnitude of this case, and the disparity in litigation resources between parties, failure to award interim fees would create a considerable risk of starving out plaintiffs with what we have already determined to be good claims.  *The district court is directed to award interim attorney's fees for plaintiffs' work in the district court and in this Court regarding the challenge to California's old escheat statute.*

With regard to these consolidated appeals, the plaintiff has lost the appeal addressing the dissolution of the preliminary injunction, but won the appeal addressing interim attorney's fees.  *The district court is directed to award interim attorney's fees for the work in district court and in this Court regarding the attorney's fees matter.  We do not address calculation of reasonable attorney's fees,* and leave that to the district court, to be resolved with such evidence, hearings, and testimony, as the district court may reasonably deem appropriate.

Id. at 1290 (emphasis added).

Fees and expense would be awardable under 42 U.S.C. § 1988.

*Chronology of the Interim Fees Motion – Post-Remand*

The Ninth Circuit decision as set forth in part above was issued, as noted on May 12, 2008.  Immediately thereafter, the Honorable William B. Shubb commenced a hearing on the issue of attorneys' fees, and decided to refer it to the undersigned on June 16, 2008.  On June 27, 2008, the undersigned asked for status reports which were filed on July 8 and 11, 2008.  On July 22, 2008, a scheduling order was issued which in part required further initial filings by plaintiffs and set forth a discovery schedule, if defendants opted for some discovery.  On August 12, 2008, the district court received the mandate of the Ninth Circuit to commence what had already been commenced in respect to deciding interim attorneys' fees.

Defendants opted to perform limited paper discovery.  The final motion concerning that discovery was held on November 12, 2008, and resolved that day as well (written order issued November 19, 2008).  The parties were tasked with filing final papers on the merits in December of 2008; because of perceived additions of new material in plaintiffs' papers, the last filing on the merits did not occur until January 5, 2009.

\\\\\

\\\\\

3

1   *Discussion*

2          The issues herein involve traditional ones usually seen in attorneys' fees motions,

3   as well as issues unique to this litigation.  The court responds to the issues as follows.

4          A.   Whether a Non- Member of the California Bar, or of This Court, May  Recover

5   Attorneys' Fees[2]

6          Defendants object to any recovery of fees by counsel Daniel Culhane on the basis

7   that Mr. Culhane is not a member of the California bar or the bar of this court.  Ninth Circuit case

8   law, prior to February 17, 2009, interpreting Birbrower, Montalbano etc . Superior Court, 17 Cal.

9   4th 119, 70 Cal. Rptr. 2d 304 (1998) directed a conclusion in defendants' favor, but only insofar

10  as Mr. Culhane's activities were directed at "practice" while the case resided in the district court

11  as opposed to the Ninth Circuit.  On February 17, 2009, the Ninth Circuit, with Judge Rymer

12  dissenting, decided Winterrowd v. American General, __F.3d__, 2009 WL 367696 (9th Cir. Feb.

13  17, 2009), and found that an attorney, very similarly situated to Mr. Culhane, i.e., not a member

14  of the California bar, but authorized to practice in another state, was entitled to be awarded

15  attorneys' fees in a California case for the non-appearance-in-court  writing and research, and

16  other legal activities.  But for the provision in the Local Rules of the Eastern District of

17  California, expressly making applicable to attorneys before it, all the rules of professional

18  conduct extant in the State of California, Winterrowd would control.

19  \\\\\

20

21          [2]  To the extent that plaintiffs argue that the Ninth Circuit mandate required the payment
    of fees period, and no basis for arguing that fees should not be paid could be made, the
22  undersigned disagrees.  Mr. Culhane was not counsel of record before the Ninth Circuit, the issue
    of unauthorized practice was never before the Ninth Circuit, and such non-addressed issues
23  which have cropped up on remand are not precluded from consideration by the mandate.
    Whether the fees sought were reasonable, and whether the law would be violated by paying fees
24  certainly is subsumed by "reasonable fees," and was an issue left to be decided by the district
    court by the Ninth Circuit.  "Although lower courts are obliged to execute the terms of a
25  mandate, they are free as to 'anything not foreclosed by the mandate'...." United States v.
    Kellington, 217 F.3d 1084, 1092 (9th Cir.2000) (quoting Herrington v. County of Sonoma, 12
26  F.3d 901, 904 (9th Cir.1993)).

1    There is no dispute that Mr. Culhane is not a member of the State Bar of

2    California, nor has he been admitted to practice before this court.  He does state in his declaration

3    that he is admitted to the Colorado bar and is inactive in the District of Columbia bar.

4    Declaration filed July 31, 2008.   He also states that he has been admitted to practice before the

5    Ninth Circuit; however, to the best of the undersigned's knowledge, he has made no actual

6    appearance there in this case.[3]  Mr. Culhane also declares that he has "worked as associate

7    counsel in this case with William Palmer, attorney of record for Plaintiffs herein."  After touting

8    his experience, Mr. Culhane declares: "I collaborate closely with William W. Palmer, who

9    supervises all of my work in this case."  Mr. Culhane declares that he "is a member" of Mr.

10   Palmer's firm.  Mr. Palmer, in his July 31, 2008 declaration at para. 5 stated that Mr. Culhane

11   "joined his firm and began working on the case under his supervision."  Mr. Culhane never

12   considered to be admitted *pro hac vice* until recently when his ability to recover attorneys' fees

13   were at issue.

14   California law would seem to be important in deciding whether fees can be

15   awarded for district court related activities in that the local rule in the Eastern District requires

16   California bar membership for admission to the Eastern District bar with exceptions not pertinent

17   here.  E.D. Cal. Local Rule 83-180(a):

18   **Admission to the Bar of this Court.**  Admission and continuing membership in
     the Bar of this Court are limited to attorneys who are active members in good
19   standing of the State Bar of California.

20   Moreover, and unlike the local rule at issue in <u>Winterrowd</u> ,the court has made applicable the

21   attorney professional conduct rules otherwise applicable in the State of California.  E.D. Cal.

22   Local Rule 83-180(e): expressly adopting the "standards of professional conduct required of

23   members of the State Bar of California and contained in the State Bar Act, the Rules of

24   Professional Conduct of the State Bar of California and decisions of any Court applicable

25

26   [3]  The Ninth Circuit does not require that an attorney be a member of the California bar to
     practice before the Ninth Circuit.  Ninth Circuit Rule 46(a).

1  thereto."

2          If the "practice of law" were limited under California rules to affirmative

3  appearances in court, either in writing or person, Mr. Culhane's advice to his clients and ghost

4  writing on behalf of Mr. Palmer would be of no import.  However, California law is to the

5  contrary, and includes legal research performed in a case, brief writing, and written or oral advice

6  to clients in California even without appearing in court.  <u>Birbrower</u>, 17 Cal. 4th at 128, 70 Cal.

7  Rptr. 2d at 308.   <u>See</u> <u>also</u> <u>id</u>. at 129, 70 Cal. Rptr.2d 309:  "If we were to carry the Dissent's

8  narrow interpretation of the term "practice law" to its logical conclusion, we would effectively

9  limit section 6125's [unauthorized practice of law] application to those cases in which

10  nonlicensed out-of-state lawyers appeared in a California courtroom without permission."

11  Further, "'No one may recover compensation for services as an attorney at law in this state unless

12  [the person] was at the time the services were performed a member of the State Bar.'" <u>Id</u>. at 127,

13  70 Cal. Rptr. 2d at 308.

14          The Ninth Circuit has adopted <u>Birbrower's</u> rule for cases in which admission to

15  the State Bar is required.  In <u>Z.A. v. San Bruno Park Sch. Dist</u>, 165 F.3d 1273 (9th Cir. 1999), a

16  non-California admitted attorney represented a client in an IDEA (special education) state

17  administrative proceeding.  As is the case here, the non-California attorney had been admitted to

18  the bar of a federal court (N.D. Cal.), which at the time did not require state bar membership.

19  When attorneys' fees for that proceeding were denied, the client brought suit in federal court

20  seeking attorneys fees for the lawyer.  The Ninth Circuit, relying on <u>Birbrower</u> held: " A person

21  is or is not licensed to practice law in a particular forum.  There is no half-way.  If not licensed,

22  one cannot practice in that forum, *and cannot charge, or receive attorney's fees* for such services

23  under penalty of criminal law." <u>Id</u>. at 1276. (Emphasis added)

24          Similarly, in <u>Shapiro etc. v. Paradise Valley Unified</u>, 374 F.3d 857 (9th Cir.

25  2004), another fee shifting IDEA case, the Ninth Circuit refused to permit fees accruing from a

26  state administrative hearing even though opposing counsel had "consented" to participation by

1  the non-admitted attorney.  No fees were to be authorized until the attorney had made a bona fide

2  and approved application to be admitted *pro hac vice*.

3         However, in Winterrowd, the Ninth Circuit refused to find that an Oregon

4  attorney, who had simply advised his son at length and reviewed pleadings, concerning a

5  litigation pending in the Central District of California, was subject to the rules or case law of

6  California when the case was pending in a *federal* court.  Winterrowd emphasized that Birbrower

7  itself had found that California law did not apply *per force* to practice in federal court.  2009 WL

8  367696, *4.  It also found that the mere California State Bar admission requirement imposed by

9  the Central District did not mean that all of California law applied to the practice of law in

10 federal court.  Id. At *4 (n.1).  There was nothing before the Winterrowd court, however, akin to

11 the Eastern District rule which *expressly* adopted the standards *and case law* applicable to

12 attorney practice.  This makes all the difference.

13        Winterrowd relied on In re Poole, 222 F.3d 618, 620 (9th Cir. 2000) for the

14 directive that California law cannot control practice before the federal courts.  Moreover, as

15 Birbrower found: "The Act [unauthorized practice of law statute] does not regulate practice

16 before United States Courts."  Birbrower, 17 Cal. 4th at 130, 70 Cal. Rptr. 2d at 310.  That is, the

17 Act does not regulate practice unless the federal court itself requires adherence to the California

18 law.  Poole emphasized that the rules of practice before federal courts are governed by the local

19 rules of that court: "Pursuant to their exclusive authority over members of their bar, federal

20 courts have promulgated local rules pertaining to admission and discipline."  Poole, 222 F.3d at

21 621.  The Eastern District has promulgated such rules, and unlike many other districts, has

22 directed that California law is to apply to its practice before this federal court.

23        Nor is this local rule simply some hortatory guidance.  "Local rules are 'laws of

24 the United States.' United States v. Hvass, 355 U.S. 570, 575, 78 S. Ct. 501, 504, 2 L.Ed.2d 496

25 (1958)."  Marshall v. Gates, 44 F.3d 722, 724 (9th Cir. 1995).  It will simply not do here to

26 disregard the plain language of the Eastern District local rule which adopts California law, even

7

1    its case law, as the rules of practice.

2           And, Mr. Culhane is not a complete stranger to this court.  Like the attorney in

3    San Bruno, Culhane has filed declarations in federal court advising the court as to the proper

4    hourly rate and why plaintiffs were fully successful on their federal law claim.  Through

5    plaintiffs, he has requested the court to award him attorneys' fees *for the work performed in this*

6    *California case*.  If the Eastern District, through its express adoption of  California law, cannot

7    regulate this attorney, it is tantamount to holding that a federal court may not adopt state law as

8    its rule of practice.  Until such time as such a holding is directed, the undersigned will not argue

9    with California law defining what constitutes the practice of law.

10          Winterrowd observed that Birbrower had referenced the Court of Appeal opinion

11   in the state case to the effect that it had distinguished the situation from Birbrower where an out-

12   of-state attorney was working with a California bar member.  And, California law does permit

13   such activity by an out-of-state lawyer in *limited* circumstances.  Cal. Rule of Court 9.47.

14   However, the undersigned is not persuaded that being "supervised" by Mr. Palmer permits Mr.

15   Culhane to practice law in California.  Cal. Rule of Court 9.47, which allows supervision of out

16   of state attorneys doing legal work in California in *limited* circumstances (both temporally and

17   substantively) is not sustainable here.  The requirements of subsection(b), which are conjunctive,

18   requires that the supervised attorney be "already" representing the client for whom services are to

19   be given, except in the situation where a prospective client is attempting to determine whether to

20   retain the out-of-state attorney.  Cal. Rule of Court 9.47(b)(2).  This, of course is not the case

21   here.  An affirmative statement that the out-of-state attorney is not a member of the California

22   Bar is required to be made on the webpage of either the supervising attorney or supervisee, §

23   9.47(b)(3).  Such has not been done here.  See Court Attachment A to these Findings and

24   Recommendations which is the introductory page to the Palmer Law Group.  The out-of-state,

25   supervised attorney must not establish a "systematic or continuous presence in California for the

26   practice of law," § 9.47(d), nor may the attorney "regularly engage in substantial business or

professional activities in California," § 9.47(d)(5).  Mr. Palmer states that Mr. Culhane has

"joined his firm," and as the website attests, there are no limitations on that joinder.  Mr. Culhane

declares that he "is a member" of Palmer's California firm.  One cannot reasonably argue that

being a member of, and working on behalf of, the California firm is not a systematic or

continuous presence in California.  In addition, Mr. Culhane's fees in this matter exceed one

million dollars incurred over the course of years; no reasonable argument can be made that such

activities are not a "substantial" and "regular" business activity in California.

"Supervision" is not a tool by which non-admitted attorneys may avoid admission requirements

for an omnibus practice in California.[4]

       Having determined that California law governs the outcome here, the undersigned

explores the one other exception set forth in <u>Winterrowd</u> which might allow Culhane to be

compensated for all hours.  The first is whether Culhane "would certainly have been permitted to

appear *pro hac vice* as a matter of course had he or she applied," citing <u>Spanos v. Skouras</u>, 364

F.2d 161, 168 (2nd Cir. 1966).  <u>Winterrowd</u>, 2009 WL 367696 *6.  First, this dicta in

<u>Winterrowd</u> (the <u>Winterrowd</u> panel did not ultimately base its decision on *pro hac vice*) would

appear to be inconsistent with <u>Shapiro</u>, <u>supra</u>, in which the attorney was not awarded fees until he

actually had made a *pro hac vice* application and was approved.  Assuming that the two decisions

are nevertheless not in conflict, it is far from certain that Culahne would have been permitted to

appear *pro hac vice* in that the Eastern District local rules deny this ability if the appearing

lawyer is regularly employed in California, or is regularly engaging in professional activities in

California.  E.D. Cal. Rule 83-180(b)(2).  Again, not only is Mr. Culhane a "member of the

[California] firm," and hence "regularly employed" in California,  he also substantially practices

in California as attested by his appearance and work in other escheat litigations around the state.

_____

   [4]  <u>Winterrowd</u> also relied on a Tenth Circuit case interpreting the ABA guidelines which
would allow a supervised attorney to practice in another state.  Because this district has expressly
adopted California law, this discussion does not apply here.

1    There are several reasons why Mr. Culhane's attorney work should not be

2    compensated for fees accruing at the district court level.  As "associate counsel," and "a member

3    of the firm," Mr.Culhane is not some type of paralegal, or low level attorney tasked with routine

4    legal work or research, performed at the request of the senior partner.  Moreover, hiring an out-

5    of-state attorney to perform over $1,000,000,000 in legal work is not the type of "expense" which

6    would ever be approved under § 1988.  While in infrequent cases involving esoteric subjects

7    such as foreign law, an attorney could act as an expert witness and be compensated as such, the

8    present case is not one of them.  Moreover, being an expert is different than simply taking on the

9    attorney's mantle and performing as any litigation counsel would.  Indeed, a need to seek over a

10   million dollars worth of advice and writing from a counsel not of record would undercut the

11   litigation counsel's request for a high hourly fee.  One should not obtain premium rates if one is

12   not up to the legal task at hand.

13   However, defendants are incorrect in arguing that *all* of Mr. Culhane's fees should

14   be disallowed.  As set forth above, the Eastern District requires such adherence, and requires

15   State Bar admission; however, the Ninth Circuit does not.  Ninth Circuit Rule 46(a).  And, Mr.

16   Culhane is a member of the Ninth Circuit bar.  Mr. Culhane's activities directed to the Ninth

17   Circuit are compensable; those directed to the district court are not.  Thus, all Culhane hours

18   expended at any time an appeal was pending (from notice of appeal to disposition) will be

19   compensated as otherwise appropriate; all other hours expended will not.

20   The court finds that Mr. Culhane should not be permitted to recover fees for work

21   directed at the district court level.  However, in the event that the undersigned has relied too

22   much on the Eastern District rules as the critical distinction between <u>Winterrowd</u> and this case,

23   the better methodology would be to rule both ways – the proper hours should Mr. Culhane not be

24   permitted to practice before the district court, and the proper hours should Mr. Culhane be fully

25   authorized to practice.  In this way, a reviewing court would not have to remand the matter

26   should the undersigned be in error.

10

B. <u>General Computational Methodology</u>

As a preliminary matter, the court notes that plaintiffs' counsel bears the burden of supporting his request for fees and costs. <u>Fischer v. S.B. P.D. Inc.</u>, 214 F.3d 1115, 1121 (9th Cir. 2000).

This circuit uses the "lodestar" method of calculating attorneys' fees – the court multiplies a "reasonable" hourly rate by the number of hours "reasonably" expended in the litigation. <u>Widrig v. Apfel</u>, 140 F.3d 1207, 1209 (9th Cir. 1998) (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 103 S. Ct. 1933, 1939 (1983)). This lodestar amount is presumptively "reasonable," and ordinarily constitutes the first (and last) prong of the analysis. <u>See</u> <u>Morales v. City of San Rafael</u>, 96 F.3d 359, 363 n. 9 (9th Cir. 1996), *amended on other grounds*, 108 F3d 981 (9th Cir. 1997). The court also, however, may conduct a second prong of the fee analysis by considering whether recovery of the lodestar amount is "reasonable" in light of twelve factors which may counsel in favor of adjusting the lodestar calculation. <u>See</u> <u>Fischer v. SJB-P.D. Inc</u>, 214 F.3d 1115 (9th Cir. 2000); <u>Kerr v. Screen Extras Guild, Inc.</u>, 526 F.2d 67 (9th Cir. 1975).

The twelve <u>Kerr</u> factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

<u>Id</u>. at 70.

If the Court considers the <u>Kerr</u> factors, it may not "double count" any factor used to adjust the first prong determination of "reasonable" hours times "reasonable" rate. <u>See</u> <u>Corder v. Gates</u>, 947 F.2d 374, 377 (9th Cir. 1991). For example, if in computing the lodestar, the court reduced the attorney hours expended in light of the results obtained, the court may not again consider, in summary fashion, results obtained to reduce further the resulting computation. <u>See</u>,

1  e.g. Chalmers v. City of Los Angeles, 796 F .2d 1205, 1210 (9th Cir.1986) *reh'g denied,*

2  *amended on other grounds*, 808 F.2d 1373 (9th Cir.1987) (to the extent the Kerr factors are not

3  addressed in calculating the lodestar, they may be considered in determining whether the fee

4  award should be adjusted upward or downward, once the lodestar has been calculated).  The

5  Ninth Circuit prefers that any Kerr adjustments be made when computing the reasonable hours

6  expended, and not in any summary second prong.  Morales, 96 F.3d at 364; Gates v. Deukmejian,

7  987 F.2d 1392, 1404 (9th Cir. 1992).

8          Boiled down to its real essence, and within the parameters discussed above, there

9  are two major reasonableness inquiries vis-a-vis hours spent on a litigation: (1) without regard to

10  adequate success, is the actual time spent on an activity(s) that which would be spent by a

11  competent attorney, and (2) assuming that the hours spent were necessary, i.e., unavoidable in the

12  litigation, did the level of success obtained justify the expenditure of the otherwise necessary

13  hours.[5]  These reasonableness criteria do not overlap, do not apply to the same considerations,

14  and are not a duplicative deduction when made.  The first, for example, would go to determining

15  whether 80 hours was necessary to draft an opposition to summary judgment, regardless of the

16  level of success in the lawsuit ultimately obtained (did the attorney waste or pad time); the

17  second goes to determining whether the reasonable amount of time spent on litigation activities

18  as a whole found in inquiry (1) can be justified by the outcome of the case (the otherwise

19  reasonable hours expended are so exorbitant in light of the relief obtained that an adjustment

20  must be made).  In this case, defendants argue both that the hours expended were unreasonable,

21  and that the rather minimal relief obtained by the injunctive relief decree thus far in light of the

22  expenditures to obtain that relief – a tail wagging the dog argument.

23

24          [5] Most of the Kerr factors are subsumed within the initial calculation of reasonable hours.
   Cabrales v. County of Los Angeles, 864 F.2d 1454, 1464 (9th Cir. 1988) *vacated on other*
25  *grounds* County of Los Angeles v. Cabrales, 490 U.S. 1087, 109 S.Ct. 2425 (1989).  In reality,
   the most significant Kerr adjustment factor is the success on the merits, often termed the critical
26  factor in analyzing the reasonableness of attorneys' fees.  Dannenberg v. Valadez, 338 F.3d 1070,
   1075 (9th Cir. 2003).

1    This is precisely the methodology utilized in Morales, supra.  The district court

2 was to first calculate the "number of hours the prevailing party reasonably expended on the

3 litigation" [to then be multiplied by the appropriate hourly rate], 96 F.3d at 363, and then the

4 district court "was not only free but obligated to consider 'the results obtained'...or 'the extent of

5 his success.'" Id. At 364.  See also Dannenberg v. Valadez, 338 F.3d 1070, 1075 (9th Cir. 2003)

6 ("[w]hen a plaintiff achieves only partial or limited success, the product of hours reasonably

7 expended on the litigation as a whole times a reasonable hourly rate may be an excessive

8 amount") (quotations and citation omitted); McGinnis v. Kentucky Fried Chicken of California,

9 51 F.3d 805, 810 (9th Cir. 1995) ("it is an abuse of discretion for the district court to award

10 attorneys' fees without considering the relationship between the 'extent of success' and the

11 amount of the fee award").

12    A limited exception to the lodestar calculation exists if a plaintiff achieves only

13 "nominal" or "technical" success.  Farrar v. Hobby, 506 U.S. 103, 115, 113 S. Ct. 566 (1992).  In

14 that case, the court can simply award "low fees or no fees" without engaging in the lodestar

15 calculation.  See Morales, 96 F.3d at 362-63 (finding that plaintiff's damages award of $17,500

16 "while substantially less than what he sought, was not nominal").  The Farrar exception has

17 rarely been applied in this circuit, in which the term "nominal damages" most frequently has

18 connoted cases in which plaintiff received no recovery or exceptionally small monetary awards,

19 such as $1.  See Morales, 96 F.3d at 362 n. 6 (collecting cases).  Even a plaintiff who received

20 only "nominal" damages still may be deemed to have achieved significant success if he or she

21 prevailed on "significant" issues or if the litigation served an important "public purpose." Id. at

22 362.

23    In this case the Farrar exception (skipping altogether a lodestar analysis) does not

24 apply.  The relief thus far, although arguably less than the complaint indicated was available, or

25 even less than that sought by way of preliminary injunction, was more than nominal; therefore,

26 the court must conduct a lodestar analysis.  As explained earlier, this does not mean that

13

1   adjustments to the lodestar will not be made because of a dearth of success on the merits.

2   Plaintiffs' relative success, or lack thereof,  remains a critical factor in adjusting the lodestar.

3        C. Appropriate Hourly Rate

4        The undersigned commences discussion by recognizing plaintiff's argument that

5   hourly rates currently in effect should be the ones to be applied as these rates compensate for the

6   delay in receiving fees over the years.  In re Washington Public Power, 19 F.3d 1291, 1305 (9th

7   Cir. 1994) (recognizing this methodology as one appropriate way to compensate for delay).

8        In Moreno v. City of Sacramento, 534 F.3d 1106, 1114 (9th Cir. 2008), a civil

9   rights due process case tried in the E.D. California, the appellate court again set forth factors

10  which go into the computation of an appropriate hourly rate: rates charged by attorneys in similar

11  lawsuits, counsel's skill, fee awards in other cases, the contingent nature of fee recovery, and

12  result obtained.  With respect to the $300/hr. rate initially found by the district court, and with

13  respect to analysis of the factors, the Ninth Circuit commented, "[s]o far so good."  The Court

14  went on to criticize the district court's deductions from that figure.  Here, in a case which has not

15  gone to trial, Mr. Palmer sought initially, $400/hr., and now seeks $450/hr.; Mr. Culhane initially

16  sought compensation at the rate of $400/hr; however, the most recent fees declaration submitted

17  by Mr. Palmer shows a rate of $450.00 for Culhane.  Mr. Boydston seeks fees at $350/hour.

18       The Ninth Circuit has emphasized that "[a] court awarding attorney fees must

19  look to the prevailing market rates in the relevant community."  Bell v. Clackamas County, 341

20  F.3d 858, 868 (9th Cir. 2003).[6]  "Generally, the relevant community is the forum in which the

21  district court sits."  Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir.1997); Gates v. Deukmejian,

22  987 F.2d 1392, 1405 (9th Cir. 1993).  The rate to be applied is that of plaintiffs' counsel in the

23  Sacramento area who engage in civil rights actions against governmental entities.

24  \\\\\

25  _____

26       [6] Unless, that is, local counsel is unavailable or inexperienced, and retained counsel
    ordinarily practices in another location.  Barjon, 132 F.3d at 501-02.

                                              14

A very important aspect of determining a reasonable rate is that "such rates should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their *paying clients* for legal work of similar complexity." Davis v. City of San Francisco, 976 F.2d 1536, 1545 (9th Cir. 1992), *vacated in part on other grounds*, 984 F.2d 345 (9th cir. 1993) (emphasis added). In this case, as in most cases reviewed by the undersigned, there is no hard, objective evidence concerning what a "*paying client" would actually disburse to his lawyer in comparable litigation.* See also Welch v. Met. Life Ins. Co., 480 F.3d 942,946 (9th Cir. 2007) emphasizing "paying clients."[7] Rather, calculation of the rate in this case, and in general, appears to have been, for the most part, an exercise in hypothesizing what a paying client might pay (if ever there were one to be found), and getting one's litigation allies to chime in – "that's what my rate is too." Then, an hourly rate becomes "established," when courts actually award that hourly rate. The potential for unwarranted inflation of the then established "reasonable hourly rate" is great because the increase methodology is also not based on hard, economic data, but on the same attorney suppositions, extrapolations and alliances which set the rate in the first place – enough to make a first year economics student blush with embarrassment.

Mr. Culhane's sole statement is that "[m]y normal hourly billing rate is $400.00 for cases such as this one." Culhane Declaration, docket #168, ¶ 2. Mr. Palmer's is more descriptive in initially requesting a $400/hr. billing rate, but nowhere does he state that he has ever actually and routinely received such a fee from clients in similar cases. Palmer Declaration, July 31, 2008. The proof of billing rate here is much like a house seller who declares that the value of his house is $500,000, and this will be his selling price. However, the *market* value of the house is what it actually sells for, quite often a lower price than the asserted "selling price." Nevertheless, these figures are received in declarations which implicitly ask the court to

---

[7] However, the district court is not to compute the lodestar based on the contract rate with the clients in the case at bar. Welch, supra.

1  recognize the requested billing rate as one that is actually, routinely received.  Moreover,

2  defendants had an opportunity to perform discovery on the issue of whether the asserted billing

3  rate bore any resemblance to an actual market rate, but did not do so.

4        Yet another attorney from another firm participated in this case, Mr. Boydston.  It

5  appears that this attorney may have been attorney-of-record in litigations filed in other forums

6  related to this federal case.  He claims a rate of $350/hr, but does little to establish the actual

7  *market* rate which should be applied here.  Boydston also includes hours of other associates, but

8  charges them out at $350/hr. as well.[8]

9        Plaintiffs' counsel also marshaled three declarations from competent attorneys to

10  support the hourly rate: San Francisco lawyer Gary Fontana, Sacramento attorney John

11  Diepenbrock, and Claremont lawyer Michael Bidart.  The billing rates set forth by these lawyers

12  respectively are: $635/hr. (with partners in his firm billing from $440-680/hr.), $450/hr.

13  (complex litigation), no hourly rate given, but an opinion that $400/hr. is reasonable.

14        "However, declarations filed by the fee applicant do not conclusively establish the

15  prevailing market rate."  Camacho v. Bridgeport Financial, Inc., 523 F.3d 973, 980 (9th Cir.

16  2008).  These declarations suffer, for the most part, from the dichotomy between billing rate and

17  actual paid rate.  Calculating an attorneys' fees hourly rate has to be something more than finding

18  an attorney who has a high billing rate, and then proffering that "I am in the same class as the

19  high billing attorney."  Moreover, some economic sense has to be inserted into the hourly rate

20  analysis lest attorneys' fees become a financial death penalty for those defendants who suffer the

21  misfortune of losing a case.  As seen below, word gets around concerning the level of hourly

22  rates awarded by courts, i.e., the cases act as precedent.  Courts should not permit an attorneys'

23  fees hourly rate to enter an impossibly high, upward inflationary spiral.

24  \\\\\

25  _____

26      [8] Whether Boydston should receive any compensation remains a matter in dispute despite a filed stipulation.  See infra.

1       The undersigned finds that plaintiffs have not justified an hourly rate of $450/hr–

2  a rate in excess of present, awarded rates, see below.

3       Defendants do not object to a an hourly rate of $300/hr. which is the highest rate

4  paid to defendants' counsel in this case.  Johansen Decl., docket #200, ¶ 5.  Defendants' primary

5  argument is that the fees generally awarded in the Eastern District do not exceed $325/hr.  As

6  noted in Moreno, the fees awarded in other cases is a factor to be utilized in setting the rate

7  herein.  Plaintiffs forget that the issue here is not simply what some client could or would pay

8  them per hour, but what fees should be assessed against the opposing party – the two are not

9  necessarily the same.  Plaintiffs are not entitled to retain the most expensive lawyers around with

10  the idea that the opposition, who had no say in the matter of plaintiffs' counsel retention, will

11  have to pay such expensive rates.

12       The undersigned starts with the Moreno case in which the Ninth Circuit was

13  perfectly at ease with the notion that the hourly rate in a complicated due process condemnation

14  case fully litigated in the Eastern District up through 2008 was $300/hr.  534 F.3d at 1115.

15  Defendants set forth rates in other relatively recent cases in the Eastern District whose rates

16  ranged from $300/hr.to $350/hr.  Defendants' Opposition filed December 5, 2009 at 23.  See also

17  Alaniz v. Peppercorn, 2008 WL 5000191 (E.D. Cal. Nov. 21, 2008) (a Title VII/FEHA case).

18  Plaintiffs do not dispute these rates in terms of their demonstrating that Eastern District cases

19  have consistently awarded attorneys' fees at a higher rate.  Defendants themselves say that the

20  highest rate paid to their attorneys is $300/hr.  Johansen Decl., docket #200, ¶ 5.

21       The type of fee in this case was contingent.  And as stated below, plaintiffs were

22  successful enough such that no paring of the hourly rate is warranted based on these factors.

23       Balancing all factors, including that plaintiffs did not establish the rate of

24  "paying" Sacramento clients, the court finds that an appropriate hourly rate is $335.00/hr.

25       Defendants do not challenge the $70/hr. hourly rate for paralegals.  That rate will

26  be awarded.

17

D.  Reasonable Hours Expended

The sheer number of compensable hours requested, coupled with the sheer number of objections to those hours on myriad concerns, makes adjudication of the interim fees a monumental task.  Nevertheless, dividing and conquering the issues, the undersigned finds below the reasonable hours expended.

The court utilizes the hours listed in Mr. Palmer's December 12, 2009 Supplemental Declaration filing as inclusive of all hours for which he and Mr. Culhane desire compensation.  Mr. Boydston has submitted a separate tally of hours complicated by the events in this litigation in which the parties agreed to excise many Boydston hours as they were spent on other litigations.  A detailed analysis follows.

1.  *The Mandate*

In ordering the district court to award interim fees, the undersigned presumes that the Ninth Circuit chose its words carefully.  It ordered (emphasis added):  "The district court is directed to award interim attorney's fees for plaintiff's work in the district court and in this Court regarding the challenge to California's *old* escheat statute.... The district court is directed to award interim attorney's fees for the work in district court and in this Court regarding the *attorney's fees matter*.  We do not address the calculation of attorney's fees...."  Taylor v. Westley, 525 F.3d at 1290.

In so ordering, the Ninth Circuit expressly found that the plaintiffs had lost the issue of challenging the *new* escheat statute, i.e., plaintiffs lost on their issue of dissolution of the preliminary injunction on account of the new legislation.  Id.  In light of this express recognition, coupled with the express directive to award fees on challenge to the *old* escheat statute, the undersigned is constrained not to count any hours, at least on an interim basis, regarding the challenge to the new statute.

For the most part, plaintiffs' counsel expressly and correctly did not bill for hours related to opposing the motion to dissolve the injunction.  In a possible slip through, plaintiffs'

18

1  counsel has claimed several hours relating to district court the dissolution of the preliminary

2  injunction, i.e., new statute matters.  In addition, plaintiffs' counsel made no accounting for time

3  spent in preparing for and attending the most recent appellate oral argument – a good bit of the

4  time had to deal with the dissolution issue.  Nevertheless, defendants do not oppose the interim

5  fees motion specifically on this basis.  While defendants do have a general argument, running

6  throughout the case, that plaintiffs seek compensation for work on issues for which they were not

7  successful, the court finds that such a generic argument does not object to specific hours

8  expended for work in opposing dissolution of the injunction.  Other than those eliminated by

9  plaintiffs already, no hours will be deducted on the basis that plaintiffs' fee requests exceed the

10  scope of the mandate.

11               2.  _Adequate Time Description_

12         Defendants believe that plaintiffs have failed to provide adequate descriptions of

13  the work activity for which they seek fees.  Plaintiffs have submitted over 1600 time entries.

14  Most entries are understandable to the undersigned, if only through their context, although there

15  are some which do not clearly reflect the type of work engaged in during the activity, e.g., simple

16  description of "telephone call, or "legal research."  There is also a substantial amount of  "block

17  billing" – a type of multiple work entry which is frowned upon because the precise time spent on

18  a single item in the block is unknown, e.g., conference with co-counsel, legal research and

19  writing, e-mails to client – all in one time entry of 7 hours.[9]  Block billing is particularly unfair in

20  a fees motion because it hides quite possibly excessive time spent on a particular activity.  In the

21  hypothetical example above, it may be that counsel talked for 4 hours getting nothing much

22  accomplished, and performed little research and writing, but who is to know.  In reviewing a

23

24         [9]  For example, on August 2, 2002, the following entry appears: "Begin drafting
     procedural history; LR standard of review; TCW DJC and other attorney; Review Time
25     Scheduling Order."  A total of 8.7 hours were expended on these activities.  These separate
     activities should have been broken out as one does not know how long the legal research took as
26     opposed to the phone call and so forth.

multiplicity of block billings, the abuse of too many conferences, for example, is difficult to

ascertain because the time is hidden among a myriad of tasks whose individual time is also

unknown.  The Ninth Circuit agrees:

> We do not quarrel with the district court's authority to reduce hours that are billed
> in block format.  The fee applicant bears the burden of documenting the
> appropriate hours expended in the litigation and must submit evidence in support
> of those hours worked.  See Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th
> Cir.1992).  It was reasonable for the district court to conclude that Welch failed to
> carry her burden, because block billing makes it more difficult to determine how
> much time was spent on particular activities.  See, e.g., Role Models Am., Inc. v.
> Brownlee, 353 F.3d 962, 971 (D.C.Cir.2004) (reducing requested hours because
> counsel's practice of block billing "lump[ed] together multiple tasks, making it
> impossible to evaluate their reasonableness"); see also Hensley, 461 U.S. at 437,
> 103 S.Ct. 1933 (holding that applicant should "maintain billing time records in a
> manner that will enable a reviewing court to identify distinct claims"); Fischer v.
> SJB-P.D. Inc., 214 F.3d 1115, 1121 (9th Cir.2000) (holding that a district court
> may reduce hours to offset "poorly documented" billing).

Welch v. Metropolitan Ins. Co, 480 F.3d 942, 948 (9th Cir. 2007).

The undersigned finds that little would be gained by discussing each entry, as the

undersigned does not desire to make this fees motion his life's work, and block billing in a fee

motion of this size is very unfair to the court.  There are cases going unadjudicated as the

undersigned/staff spends time on this mammoth fees motion.[10]  While the court is not authorized

to simply deduct hours by a specified percentage because of block billing, Welch, supra, to the

extent that block billing has occurred, or there are non-descriptive references, the consequences

of such will be visited upon plaintiffs in that section which discusses whether excessive time was

spent in litigation during discrete stages of the case.

### 3. *Failure to Reduce Hours in Accordance with Stipulation*

The precise failures in this regard, if any, will be accounted for in each section

discussing excessive hours spent in each of the various stages of this litigation.

---

[10]  Exhibit A to Palmer's Supplemental declaration is the Time Report and Invoice.  It
consists of approximately 75 pages, with about 20 entries on each page, for a total of 1,600
separate entries.  Defendants' objections to these entries is 65 pages long, with about 20 entries
on each page, for a total of about 1,300 objections.

1        *4. Secretarial and Paralegal Activites Engaged in By Attorneys*

2        It would take the divination powers of Greek priests at the Oracle at Delphi to

3    *accurately* determine, for the entirety of this case, all of the secretarial or paralegal work engaged

4    in by the attorneys in this case.  At times, when drafting a brief, attorneys will type into their

5    word processor, rather than hand scrawl or dictating – is this secretarial?  Moreover, when an

6    attorney has finished a memo or other document, and desires its immediate dissemination, it is

7    oftentimes easier and more efficient for an attorney to perform that simple task.  At times,

8    attorneys need to perform investigation on their own to understand the facts first-hand;

9    organization of files is not beneath an attorney when it assists in quickly retrieving facts or law at

10   a later time.

11       On the other hand, defendants are correct that the opposition should not be

12   charged hundreds of dollars per hour when an attorney is performing functions traditionally

13   relegated to staff, and which take substantial time.  The problem is – block billing, for the most

14   part, precludes knowledge of how much time was spent performing the staff functions.

15       The undersigned thinks it best to make adjustments for the secretarial/paralegal

16   activities of the attorneys when viewing the excessiveness of hours as a whole.  The substantial

17   hours deducted take into account defendants' secretarial/paralegal arguments.

18       *5. Seeking Time on Unsuccessful Claims – The Hensley Issue*

19       Defendants review the claims in plaintiffs' complaints in this matter, and make

20   the assertion that plaintiffs only prevailed upon part of one claim.  Hence, the argument

21   continues, according to attorneys' fees law in the context of a case which has been finally

22   adjudicated, the interim fees motion should be extensively reduced because of a lack of success

23   on "failed" claims.  Defendants' <u>Hensley</u> arguments are misguided at best in that they ignore the

24   fact that the present case is not a completed case; no one of plaintiffs' claims in the complaint has

25   been finally litigated; and that a substantial amount of time, if not the majority of time expended

26   thus far, was spent on contesting *defendants'* Eleventh Amendment defense, an issue plaintiffs

certainly prevailed upon.  In other words, defendants fail to grasp the context of circumstances in which the interim fees motion is made.  *For the most part*, the separate-the-good-claims-from-the-bad-claims aspect of Hensley is inapposite because of the circumstances of this case at the time interim fees have been required.

Before setting forth the traditional Hensley law, it makes sense to divide the lengthy proceedings thus far into discrete stages, as one will observe in the discussion afterwards that Hensley has no application to most of the stages:

Stage I – The Pre-Complaint Filing Research and Investigation.  This stage commences with the first attorneys' fee entry in the Palmer December 12 Declaration (hereafter Fees Declaration), January 2, 2001, and terminates with the filing of the Complaint, December 31, 2001.  During this stage plaintiffs seek compensation for **446.6** hours.  No Culhane hours are at issue here.  There are no Boydston hours for this stage.

Stage II – The Pre-Response Period.  This stage commences with the first entry in the Fees Declaration after the filing of the Complaint, January 2, 2002, and terminates with the last entry prior to the filing of the motion to dismiss (Eleventh Amendment Grounds,) April 19, 2002.  Nothing of claim dispositive substance occurred during this stage.  During this stage, plaintiffs seek compensation for **35.5** hours.  No Culhane hours are at issue here.  There are no Boydston hours for this stage.

Stage III – Litigation of the Motion to Dismiss.  This stage commences with the first recorded entry in the Fees Declaration after the filing of the motion to dismiss, April 22, 2002, and terminates with the entry showing receipt of Judgment in this case, June 13, 2002.  Plaintiffs seek **274.8** hours in compensation for litigation of the motion.  No Culhane hours are at issue here.  There are no Boydston hours for this stage.

Stage IV– The First Appeal.  This stage commences with the entry in the Fees Declaration reflecting preparation of the Notice of Appeal June 16, 2002, and terminates with that entry showing receipt of the Court of Appeal decision, May 13, 2005.  Plaintiffs seek **3,087.0** hours for

the first appeal stage.  No Culhane hours are at issue here because Mr. Culhane, who was

introduced to the case only after the motion to dismiss, performed his work on matters pending in

the Ninth Circuit.  Boydston's stipulated hours for this stage are **99.0**.[11]

Stage V– <u>Preliminary Injunction (First)</u>.  The vast majority of entries in this stage involve

plaintiffs' attempt at enjoining the Controller in respect to escheat procedures.  This stage

commences with the first entry in the Fees Declaration after receipt of the appellate decision,

May 16, 2005, and terminates with the order denying the injunction, filed August 16, 2005.

Plaintiffs seek **902.2** hours for this stage.  Culhane hours are involved, and ultimately will not be

counted.  Boydston's stipulated hours for this stage are **14**.

Stage VI – <u>The Second Appeal</u>.  This stage commences with the first entry in the Fees

Declaration evidencing planning whether to appeal, August 17, 2005, and terminates with the

entry showing receipt of the second Court of Appeal decision, April 30, 2007.  Plaintiffs seek

**1017.3** hours for work during the second appeal.  Culhane hours are not at issue because his work

was undertaken in this stage for Ninth Circuit purposes.  Boydston's stipulated hours for this

stage are **17.2**.

Stage VII – <u>Preliminary Injunction (Second), Dissolution of the Preliminary Injunction, and the</u>

<u>Interim Fees Motion</u>.  This stage commences with the first entry in the Fees Declaration after

receipt of the Ninth Circuit decision, May 1, 2007, and ends with the entry evidencing a notice of

---

[11]  As set forth in the text, <u>infra</u>, Boydston's hours were the subject of stipulation after discovery motion.  To the extent that defendants contend that all of Boydston's hours were deleted, they are incorrect.  During the November 12  motion to compel, at which time the stipulation was reached, the court tried in vain to have defendants locate an e-mail which formed the basis of the stipulation regarding Boydston's hours so that it could be read into the record.  The court finally asked Mr. Palmer to what he was agreeing, and he stated that he would agree to delete those Boydston hours *to which defendants had made objection*.  November 12, 2008 transcript at 16.  The formal stipulation to which defendants refer was filed on November 17 and contained the objected to hours in the e-mail attached to the stipulation (numbered paragraphs 1 and 2 of the e-mail).  The attached e-mail also contained a "proposal" to delete all of Boydston's hours but the e-mail left that proposal up in the air.  The court does not consider the "proposal" to be an "objection."  Therefore, only paragraphs numbered 1 and 2 constitute the objections, and the hours denoted in those paragraphs are the only ones which will be deleted.

appeal with respect to the interim fees motion, November 21, 2007.  There may be some appellate overlap (very little) because a notice of appeal regarding the dissolution of the preliminary injunction, was filed slightly before the second appellate notice (fees appeal), and during some of the time the interim fees matter was at issue.  Plaintiffs seek **855.2** hours.  The Culhane hours will be disallowed.  Boydston's stipulated hours for this stage are **12.1**.

Stage VIII – The Third Appeal.  This stage commences with the entry in the Fees Declaration evidencing the preparation of the Notice of Appeal of the Interim Fees Issue, November 21, 2007, and terminates with the entry showing receipt of the third appellate decision, May 12, 2008.  Plaintiffs seek **484.6** hours.  Culhane hours are not at issue here because this work was undertaken while an appeal was pending.  For the most part, plaintiffs do not seek hours associated with that part of the Appeal dealing with dissolution of the preliminary injunction.

Stage IX – District Court After Third Remand; Matter of Interim Attorneys' Fees.  This stage commences with that entry in the Fees Declaration just after receipt of the third appellate decision, May 13, 2008, and continues to the last entry.  No matters aside from interim attorneys' fees, and a motion for such fees, have been at issue in this stage.  Plaintiffs seek **504.7** hours.  Culhane hours are at issue, and will not be counted.  There are no Boydston hours for this stage.

The court's final Palmer/Culhane tally is 7607.9 hours, less than 4 hours difference from plaintiffs' total.  Because defendants did not object to plaintiffs' total, from an arithmetic standpoint, the court will add in 3.7 attorney hours in the final money tally.

As previously mentioned in footnote 10, the Boydston hours were the subject of stipulation after discovery motion.  The hours permitted by terms of the stipulation total 142.3.

The hours for Palmer and Culhane referenced in the fees declaration will be tallied in the section below discussing the reasonableness of the hours.  They will be tallied together, as Palmer and Culhane are members of the same firm, and also broken out.  Boydston hours will be tallied separately in each pertinent stage where they appear.

\\\\\\

As concluded above, defendants' <u>Hensley</u> objections do not pass muster given the circumstances at the time interim fees were awarded.  A traditional <u>Hensley</u> analysis, usually undertaken when final judgment has been entered, is set forth as follows:

A second critical component of attorney's fee calculations under 42 U.S.C. § 1988 is found in the Supreme Court's analysis in <u>Hensley</u>.  Under <u>Hensley</u>, the reasonableness of a fee award is determined by answering two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" 461 U.S. at 434, 103 S.Ct. 1933.  In this case, while the district court properly answered "no" to the first question, it failed to properly analyze the award in light of the second question.

1. *Unrelated Claims*
A plaintiff is not eligible to receive attorney's fees for time spent on unsuccessful claims that are unrelated to a plaintiff's successful § 1983 claim.  Such unrelated claims must be treated as if they had been raised in a separate lawsuit to realize "congressional intent to limit awards to prevailing parties." *Id* at 435, 103 S.Ct. 1933.  However, in a lawsuit where the plaintiff presents different claims for relief that "involve a common core of facts" or are based on "related legal theories," the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis.  *Id*.  Instead, the court must proceed to the second part of the analysis and "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id*.

2. *Level of Success*
The City claims the amount of attorney's fees awarded to McCown was disproportionate to the amount he received on his one successful claim.  Specifically, the City argued that because McCown only prevailed on one of his nine original claims, receiving a fraction of what he originally requested in his settlement demands, his attorney's fees and costs should be reduced to a similar fraction.  The district court indicated that it was unsure whether the fact that eight of McCown's nine claims were dismissed at summary judgment "figures into the calculation" of attorney's fees.  We conclude that it does.

Although we can understand why our able district court colleague may have found the case law on this issue to be inscrutable, we hold that attorney's fees awarded under 42 U.S.C. § 1988 must be adjusted downward where the plaintiff has obtained limited success on his pleaded claims, and the result does not confer a meaningful public benefit. FN2 This conclusion follows largely from Hensley itself, where the Supreme Court noted that "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." 461 U.S. at 440, 103 S.Ct. 1933.FN3
[Footnote 3]  The Court in Hensley also noted, in dicta, that "had respondents prevailed on only one of their six general claims, [rather than five of the six,] ... a fee award based on the claimed hours clearly would have been excessive." 461 U.S. at 436, 103 S.Ct. 1933.

McCowan v. City of Fontana, 550 F.3d 918, 923-924 (9th Cir. 2008).

Utilizing the stages set forth above, the undersigned finds Stage I, the pre-complaint stage, the most difficult one to determine.  Assuming, as we must, that plaintiffs are a prevailing party, because the Ninth Circuit has directed the award of interim fees, it is not possible at this early stage to determine with any precision which of the several claims brought by plaintiff are unrelated in the Hensley sense or unsuccessful, as the success or lack thereof is yet to be determined.  Defendants identify twelve disputed claims in the amended complaint ranging from improper notice to violations of securities laws.  The facts underlying each may or may not stem from a common core; it is simply not possible to gather this specific information from the entry descriptions, and there is only so much specificity that can be worked into a billing statement.  Nor have plaintiffs prevailed, or failed to prevail, on most of those – indeed, they have yet to be even addressed, and there is much work to do.  If the court were to simply take a mathematical division, i.e. divide by 12 because only one claim has thus far been proven "successful," plaintiffs might well be penalized at this interim stage because the investigation of facts in the pre-complaint stage might all be sufficiently interrelated.  On the other hand, some of the claims indeed appear to be distinct, at least by title, and to simply award plaintiffs all of the pre-complaint fees (with appropriate deductions for excessiveness) might well constitute a windfall as plaintiffs could possibly fail to achieve a level of ultimate success which would justify full fees for this stage.

Rather than attempt the impossible at this juncture, the undersigned finds as follows.  One-half of the reasonable hours expended in Stage I will be compensated without prejudice to adjustments, up or down for this stage at a later time when final fees are assessed.  The adjustment may be additions or offsets.

\\\\\
\\\\\
\\\\\

Stage II –  The post-complaint pre-response stage is not susceptible to a <u>Hensley</u> deduction.[12]

Stage III – This entire stage was related to defendants' motion to dismiss; no <u>Hensley</u> issue is present so as to require <u>Hensley</u> deductions as plaintiffs ultimately prevailed on the motion.

Stage IV– this entire stage was related to defendants' motion to dismiss; no <u>Hensley</u> issue is present so as to require <u>Hensley</u> deductions as plaintiffs ultimately prevailed.

Stage V– this entire stage was related to plaintiffs' motion for preliminary injunction; no <u>Hensley</u> issue is present so as to require <u>Hensley</u>, deductions as plaintiffs ultimately prevailed.

Stage VI – this entire stage was related to plaintiffs' motion for preliminary injunction; no <u>Hensley</u> issue is present so as to require <u>Hensley</u>, deductions as plaintiffs ultimately prevailed.

Stage VII – Plaintiffs were not successful only insofar as they contested the dissolution of the initial preliminary injunction on remand.  The inclusion of inadvertent "dissolution" hours has been discussed above.

Stage VII – Plaintiffs were not successful only insofar as they contested the dissolution of the initial preliminary injunction on remand.  The inclusion of inadvertent "dissolution" hours has been discussed above.

Stage IX – No <u>Hensley</u> deductions are appropriate in that the entire stage involves only the award of interim fees.

Defendants seek to take a mathematical approach to the concept of "prevailing" or being "successful."  That is, if plaintiffs did not receive every jot and tittle of what was sought in the various stages, they have only partially prevailed, or only have been partially successful.  The

_____

[12]All of the <u>Hensley</u> discussion for the various stages assumes, only for the moment, that plaintiffs' described hours are otherwise reasonable.

court should calculate a finite percentage of success.  Yet, the cases defining <u>Hensley</u> have never

taken such a rigid mathematical approach.  If plaintiffs failed in a very substantial way, amongst

some success, a <u>Hensley</u> deduction is appropriate, but only then.  As can be easily seen from the

above breakout, plaintiffs were largely and substantially successful in every stage save for the

first and second one.  There were no substantial failures except for dissolution hours – hours

which plaintiffs deleted.  <u>Hensley</u> has little application here.

### 6. *Reasonable Hours*

The enormity of the interim award request has generated a great deal of

controversy on what hours were reasonably expended.  Defendants are correct that the hours

listed are excessive.  As set forth above, the court first looks to the reasonableness of the hours

expended *vel non*.  The court may then reduce these hours if the success obtained is not

commensurate with the hours otherwise awardable.

The court disposes of defendants' success objection (the second prong of the

analysis), out of its normal order.  Insofar as the issues thus litigated, plaintiffs have been very

successful.  Indeed, plaintiffs have only not prevailed on the dissolution of the preliminary

injunction issue.  Defendants' argument that plaintiffs have not been very successful because

they have (not yet) obtained relief on all their claims fails for two reasons.

First, it is implicit in the mandate that plaintiffs were successful.  The Ninth

Circuit would not have gone to the trouble of remanding this case for the computation of interim

attorneys' fees if the Ninth Circuit had thought that plaintiffs were only marginally successful, or

successful only in a minute fashion.  The Ninth Circuit opinion in this case talks about plaintiffs'

"good claims."

Secondly, for the same reason that it failed in the <u>Hensley</u> section, defendants'

argument fails here.  The matter before the undersigned is an *interim* fees award for the results

obtained *thus far*.  It sets a false dichotomy to argue that because plaintiffs have not been finally

successful on all their claims, they have not been successful thus far.  As the nine Stages show,

1  plaintiffs have been successful nearly every step of the way thus far.  They have not yet had the

2  opportunity to demonstrate omnibus success.

3          In a different objection, the court will not permit "media" hours, i.e., time spent

4  preparing for, or participating in, media events.  See Greater Los Angeles Council etc. v.

5  Community Television etc. 813 F.2d 217, 221 (9th Cir. 1987); Gratz v. Bollinger, 353 F.

6  Supp.2d 929, 941-42 (E.D. Mich. 2005).  While the undersigned does not criticize such hours

7  expended, it is not reasonable to charge one's opponent for media time.

8          However, despite defendants' objections, the court will count reasonable hours

9  with respect to legislative contacts.  As the record of this case shows, the Legislature took an

10 active role in curing the found defects in the Unclaimed Property Law; it was entirely reasonable

11 for plaintiffs to engage in contacts akin to settlement discussions, both before and after the

12 preliminary injunction.

13         This brings the undersigned to the matter of excessive hours.  Two primary

14 reasons exist for the excessiveness: (1) a never ending series of billed conferences, contacts, or

15 telephone calls, e-mails, and the like (2) a seeming never ending research/drafting process in

16 which no efficiencies were realized by having two, and at times three or more, counsel involved

17 (as of the 1st appeal and thereafter), and no efficiencies realized on issues thoroughly briefed at

18 one stage, which were again at issue in a later stage and briefed again.  Moreover, one must

19 realize that this case, both in the district court and appeal, has completely been a law and motion

20 case.  There has been no discovery, no evidentiary hearings with witnesses, no trials.

21         For example, when Mr. Culhane first came into the case, the undersigned

22 reviewed each entry for contacts between counsel.  From June 16, 2002-August 29, 2002, there

23 were 110 billing entries, give or take a few.  On 86 of those entries by court count, there were

24 contact between counsel, the length of which cannot be determined for most because of block

25 billing.  However, on those billings which were singular with respect to contacts, the very

26 distinct minority, one can see that the length of time of discussion was rarely short.  For example,

on July 10, 11, 13, 17, August 3, August 18, entries on which reflected communication only, the time spent in hours was .9, 1, 1.5, 1, 1.2, and .9 respectively. Realizing that such contact took place on almost every single business day throughout the case when a billing entry was made, and at times on weekends and holidays, as reflected by the block billing, the cumulative effect of this communication throughout the entirety of the case results in a staggering number of hours.

Yes, one would expect when Mr. Culhane was first in the case, there might be more communication between counsel in order that tasks be divided and coordinated. However, the truly large amount of time expended with communication never ceases throughout the case. Literally thousands of hours are spent talking about the case. And, if it was not talk with Mr. Culhane, it was communication with unnamed "associates" who never appear in this case.

Moreover, on those days which appear to be devoted mainly to legal research and drafting, one sees hours spent in a day by a single attorney to be truly extraordinary over the life of a case. There are many days with entries by a single attorney for 10, 11, 12 or more hours per day – solely on this case. While such is not unusual every now and then for a particular day, the undersigned knows full well how difficult it is to devote uninterrupted time for long periods of time on simply writing and researching. The number of days throughout this case on which this assertedly took place, from dawn to dusk, and beyond, is not credible. Nor does the court overall believe such was necessary.

The allowable Boydston hours are largely communications back and forth between Palmer and Boydston. At times, Boydston was yet another reviewer of pleadings; his time entries are particularly unenlightening in terms of descriptive content.

The court now embarks on the lengthy analysis, Stage-by-Stage, to adjudicate defendants' "reasonableness" objections. As related above, plaintiffs' penchant for block billing has complicated the matter to their detriment.

\\\\\

\\\\\

Stage I (Pre-filing of the Complaint) –

 Hours which may not be awarded include 72 hours (fully charged at an attorneys' rate) for travel to England for meeting with a client.  As set forth in Gratz v. Bollinger, supra at 944, counsel is not entitled to be reimbursed for traveling about looking for the best clients.  Add into that general rule a trip to England to interview clients, and the hours are doubly improper.  Further, 15.5 hours are deducted in this stage for media contacts.

 The remainder of the 446.6 hours in this stage (359.1) have to do with legal research, drafting the complaint, factual investigation, and contact with clients or co-counsel.  Of those hours, approximately a total of 126.2 hours were involved in legal research/complaint drafting.  This is the equivalent of one person working 21 straight, 8 hour days, over three business weeks.  However, as previously set forth, it is presently unknowable how related all the various claims are, and to what extent plaintiffs will be successful on such claims.  Therefore, in accord with the previous discussion, the court will only order interim compensation for 1/2 of the appropriate hours (359.1) remaining, which calculates to 179.55 hours.[13]

 No further deductions will be made in this stage.  Because only Mr. Palmer documented time, the hours will be compensated at $335.00.

 Total Stage I (pre-filing) – $60,149.25 (Palmer).

Stage II (Pre-Response) – Mr. Palmer expended 35.5 hours in this stage.  No deductions will be made.  The hourly rate is $335.00.

 Total Stage II – $11,892.50

 Cumulative sub-total – $72,041.75 (Palmer).

\\\\\

\\\\\

---

[13]  Defendants object to payment of secretarial tasks at the lawyer hourly rate.  The court is not going to fly speck every entry to see if the work performed was sophisticated legal work.  The court will look to excessive administrative tasks being charged at a lawyer's rate, but does not find this to be the case during this stage.

Stage III (Motion to Dismiss)

The Controller brought a motion to dismiss based nearly entirely on the Eleventh Amendment.  Two other subsidiary issues were raised which the court did not reach.  Plaintiffs filed an opposition, argument was heard, a dismissal was ordered and judgment entered.  The entire time period for this stage comprised two months, from April 22, 2002-June 26, 2002.  Nevertheless, plaintiffs expended 274.8 hours opposing the motion to dismiss.  One person working straight 8 hour business days for nearly 7 weeks – nearly the entire time the motion was pending – would have used all these hours.  To be sure, there were a few mundane matters taking place, i.e. preparation of a status report, but the vast majority of the time was spent in formulating an opposition to the motion.  Moreover, time had been spent researching the Eleventh Amendment issue in the previous Stage I.  Whether the time in this stage was spent on conferencing, legal research, or writing, the time spent was excessive.[14]  Defendants should not have to pay for a counsel who nearly spent all day, every day in a two month period opposing one motion.  One hundred hours will be deducted in this Stage, leaving 174.8 to be compensated.

Total Stage III – $58,558.00

Cumulative sub-total – $130,599.75 (Palmer).

Stage IV (the First Appeal)

If the time spent on the motion to dismiss was excessive, the time plaintiffs' counsel spent in litigating the first appeal, on the same issue involved in the motion to dismiss – 3,087.00 hours ($1,389,150.00 at the requested rate), was unreasonably, grossly excessive.

To be sure, writing an appellate brief is not the same thing as writing an opposition to a motion to dismiss.  However, there certainly is an efficiency to be realized from having written the opposition in district court, and from having done all the research attendant to

---

[14]  Again, the undersigned complains about "block billing," which makes it impossible to determine how long the conferencing was when compared to the other tasks.  Given the incessant conferencing, and because plaintiffs' counsel bears the fallout from the block billing practice, the undersigned finds that the amount and time of conferencing was excessive.

the opposition, which should be realized on appeal.  Rather than realizing any efficiency, **plaintiffs' counsel spent 11 times the hours** in getting appellate briefing on file that were used to draft the district court opposition.  One person working 8 hour business days would do nothing else for 77 weeks, a year and one-third, to consider, research, write and argue appellate brief. Two attorneys, as was the case here, would have done nothing else for 3/4 of a year.  And this is after 95% of the Eleventh Amendment research had to have been done at the district court level given the number of hours requested for that stage.  While supplemental briefs were ordered on a Takings issue, even adding this time in there is no legitimate reason for billing so much time.

The opening brief on the Eleventh Amendment issue consumed 1,271.1 hours; the Reply was almost as long at 747.9 hours.  A motion to substitute parties after a new Controller was elected took approximately 100 hours to research and write out, even though the rules regarding such are fairly well known.  See e.g., Hoptowit v. Spellman, 753 F.2d 779, 781-782 (9th Cir. 1985).  The remaining approximate 1000 hours were expended preparing for oral argument, submitting a supplemental brief on a Takings issue, and doing some work for an appellate preliminary injunction.

Stage IV exemplifies attorneys, who do not otherwise have pending cases, filling up their time with the one which they do have.  Take as an example the just over a month long period between August 19, 2002 and September 25, 2002, a 38 day period comprised of a total of 912 hours on a *24 hour clock*.  Plaintiffs' two attorneys logged 740.9 hours.  One attorney working around the clock, seven days a week, could barely log as many hours as existed in the entire time period.  Two attorneys would have to log just under 10 hours a day, every day, weekends and holidays included, to equal the number of hours billed.

Moreover, there are literally *hundreds* of hours associated with counsel contact during this stage.  One simply cannot charge the opposition for so much conferencing.  More examples of poor billing judgment abound.  On September 26, 2002 attorney Palmer spent *over a business day,* 9 hours, organizing files and talking with co-counsel.  At his requested attorneys'

fee rate of $450/hr, Palmer seeks $4,050 for the day.  That very same day, attorney Culhane

organized his files for 4.5 hours, seeking another $2,025 – a total of organization and

conferencing between themselves of over $6,000.00 for one day.  Attorney Palmer was back at

organizing and conferencing the next day, September 27, 2002 for another full day, 8.5 hours

($3, 825).  We know that only one hour was spent on conferencing and 7.5 hours in organization

on this day because attorney Culhane registered 1 hour ($450) for conferencing with Mr. Palmer.

Thus, for *only two days*, organization and conferencing among themselves (after previous

hundreds of hours of conferencing), counsel seek more than $10,000 – not bad for fairly menial

labor.

Defendants are legitimately shocked at the number of hours requested, and the

basis for the request.  The court has not the time nor the inclination to traverse this mammoth

billing record, entry by entry, to divine what block billing entries are legitimate and which are

not.  And, because of block billing, such an endeavor would be doomed to failure in any event.

The hours expended for this stage are altogether unreasonable.  After reviewing all entries for

this Stage, the undersigned finds that a total for both attorneys of 1,500 hours at $335 for this

stage is at the high end of any reasonable amount of hours.[15]  Attorneys Palmer and Culhane can

divide it any way they so desire.

Boydston's stipulated hours are 99.

Total Stage IV ( First appeal) – $502,500.00

Cumulative sub-total (Palmer and Culhane) – $633,099.75

Boydston Stage IV– $33,165.00

Stage V– (Motion for Preliminary Injunction)

This stage encompasses the three month period of time spent in the district court

on remand up to the denial of the preliminary injunction (5/16/05-8/16/05).  The requested

---

[15]  In this and subsequent stages, the court will not break out "media hours"; these are
included in the unreasonable hours.

injunction involved two issues: (1) the Controller's seizing of property outside the scope of his

authority; the seizure of property without sufficient due process.  Nothing else of much

consequence occurred during this stage.[16]  A total of 902.2 hours is sought, and at requested rates

would require defendants to pay $405,990.00.  Simple math indicates that if counsel were paid

for every day of the week, i.e., including weekends and holidays, counsel seek $4,412.93 *per day*

for this three month period (just shy of 10 hours per day, every day).  Obviously, the hours and

sums sought cannot be justified.

The time sheets for this three month period again reveal grossly excessive

conferencing.  Because of block billing, it is not possible to give a precise figure for total

conferencing, but there are conferencing or other contacts nearly every single business day of the

three month period.   As was the case for Stage IV, the actual legal product filed does not justify

the hours spent to create it.  The court would go on to detail examples taken from the billing

records, but the "Culhane" problem requires discussion here.

As previously found, attorney Culhane was not permitted to practice before the

district court.  His hours total 450 out of the 902, a nearly perfect split of hours with Mr. Palmer.

These hours may not be counted.  The court will not deduct further hours for this stage in that

"double deductions" for independent reasons are not appropriate.  The undersigned does note,

however, that there is rough justice in the deduction.  Although the court will not detail here the

excessive hours for this stage, as numerous examples have been given throughout, the hours

which would be deducted from this stage should the Culhane deductions not be made would

reach the same result.

_____

[16]  Plaintiffs amended their complaint and sought to recuse the judge.  The amended
complaint contains the identical claims, but with the addition of new plaintiffs and a substituted
defendant.  Perhaps there are a few more facts alleged and a few theories within the claims which
were refined or supplemented.  Many entries appear in the billing sheets for work related to the
amended complaint; however, because of block billing, it is not possible to determine with
preciseness how many hours are sought for amending the complaint.  The same is true for the
motion to recuse.  Plaintiffs initially brought an application for temporary restraining order, but
this application went by the wayside as Judge Damrell soon recused himself.

1    A total of 452 Palmer hours at $335/hr. are to be compensated during this stage.

2 Boydston's stipulated hours are 14.

3    Total Stage V (Palmer and Culhane) – $151,420.00

4    Cumulative subtotal – $784,519.75[17]

5    Boydston Stage V– $4,690.00

6    Boydston cumulative subtotal– $37,855.00

7 Stage VI – The Second Appeal (Denial of the Preliminary Injunction)

8    The preliminary injunction was denied in the district court primarily on a lack of

9 Article III standing, but also on the related issue of lack of irreparable harm.  After a brief period,

10 the parties agreed to stay district court proceedings pending appeal of the injunction denial.  The

11 hours requested by both attorneys totaled in this stage, 1,017.3, a relative bargain compared to the

12 first appeal.  However, as evidenced by the other stages, there was excessive time spent in co-

13 counsel contacts/conferences, and little efficiency obtained from having thoroughly researched

14 the issues in the district court.

15    Again, block billing hides the true amount of time counsel spoke among

16 themselves.  However, in the month and one-half period between the denial of the preliminary

17 injunction and the filing of the opening brief, there were no less than 29 contacts between

18 counsel, quite possibly encompassing two business weeks of contact time.  It appears that 319

19 hours (8 business weeks of 8 hours per day for one person), minus attorney contact time, was

20 spent in researching for, and drafting, and incessantly reviewing drafts of the opening brief.

21 Similar numbers were spent for the reply brief.  Simply put, the time was excessive, albeit

22 nothing like that of the first appeal.  A reduction of 25 % in hours is warranted; 763 hours at

23 $335/hr. will be compensated.

24 \\\\\

---

26   [17]  It should be noted at this point that plaintiffs' allowed fees for the first five stages roughly equal the entirety of defense counsel fees for all the nine stages.

36

1    Boydston hours total 17.2.

2    Total Stage VI (Palmer and Culhane) – $255,605.00

3    Cumulative subtotal (Palmer/Culhane) – $1,040,124.70

4    Boydston Stage VI – $5,762.00

5    Boydston cumulative subtotal – $43,617.00

6 Stage VII (Preliminary Injunction, 2nd time; dissolution of preliminary injunction; interim fees

7 motion) –

8    Plaintiffs seek reimbursement for 855.20 hours.  However, 19.3 hours were

9 expended by the paralegal, "AC" and will be deducted from the grand total of hours in this stage,

10 leaving 835.9 hours.  The paralegal hours will be awarded separately.  Plaintiffs correctly omit

11 time for work involved with the dissolution of the preliminary injunction entered by the district

12 court previously in this stage.  Thus, the issue is whether the hours charged to have the

13 preliminary injunction issued by the district court and to have the district court award interim

14 fees are reasonable.

15    The second appeal rejected the district court's grounds for denial of the

16 preliminary injunction and also found that plaintiff's likelihood of success on the merits was

17 "high" in that notice had to be given before an individual's or entity's property was transferred to

18 the State of California, and that in any event, publication notice that one's property was about to

19 be escheated could be found at a particular website was insufficient from a due process

20 standpoint.  Thus, the direction was clear to the district court that it was to frame a preliminary

21 injunction.

22    On April 30, 2007, even before the mandate issued, the district court made

23 arrangements for the parties to gather for implementation of the soon-to-be-directed entry of

24 injunction.  A request for temporary restraining order was immediately filed by plaintiffs.  An

25 opposition to the TRO was filed mainly arguing that speed was not necessary because the

26 Controller had mitigated constitutional deficiencies.  The TRO was quickly granted by Judge

37

Shubb.  Thereafter, it was only the form and substance of the preliminary injunction order which was at issue.

If it were not for the Culhane hours, which are again at issue here, the excessive expenditure of time would be front and center, again.  Take for example the time expended for preparation and the aftermath of the TRO hearing.  This preparation took place after written material had been prepared and presented to the court.

5/5/2007   8.5 [hrs]      WWP    Hearing Preparation; Email and TCW associate attorney

5/5/2007   3.5            DJC   Email to co- counsel; TCW co-counsel regarding preparation for
                                       hearing and LR

5/6/2007   0.7            WWP   Email to co-counsel regarding hearing

5/6/2007   8.5            WWP Hearing Preparation; Email from associate attorney regarding same

5/7/2007   12             WWP Prepare for and attend hearing [which appears from the docket to
                                       have been a couple of hours at most], review opposition,
                                        deal  with media inquiries; attend hearing; Fax to associate

5/7/2007   6              DJC  TCW attorney WWP regarding upcoming hearing; fax from WWP

Thus, for a temporary restraining order hearing, where: the writing had been submitted, there was only two days before the hearing, the outcome was not in much doubt (given the Ninth Circuit ruling), and the only opposition issue was whether enough curative action had taken place such that a TRO was not necessary prior to a preliminary injunction, counsel engaged in nearly a weeks worth of "confabbing" about this hearing prior to its taking place.  With the issues as well known as they were at this time, how could so much preparation and conferencing be necessary.  These entries exhibit a lack of billing judgment.

Then, after the TRO hearing, the "confabs" started all over again:

5/8/2007   3.5            WWP Multiple TCWs to attorney Daniel Culhane; Multiple
                                       TCWs to associates and emails to and from associates; Respond
                                       To media inquiries

| 5/8/2007 | 8.5 | DJC | Multiple TCWs co-counsel [this is puzzling– one co-counsel had 5 more hours conferencing with the attorney than that attorney recorded altogether for the day] |
| 5/9/2007 | 7.5 | WWP | TCWs to associates; review email from the court; Respond to media inquiries |
| 5/9/2007 | 2.5 | DJC | TCWs co-counsel; review email from the court |
| 5/10/2007 | 6.5 | WWP 6.5 | Email from associate; Review request for recon-sideration and respond to media inquiries; TCW associate attorney |
| 5/10/2007 | 3.5 | DJC | Review request for consideration; TCW co-counsel regarding same |
| 5/14/2007 | 7.5 | WWP | Email to and from associates multiple faxes to attorneys; Respond to Median (sic) inquiries |
| 5/14/2007 | 3.2 | DJC | Emails from and to co-counsel; Faxes to and from co-counsel |
| 5/15/2007 | 3.5 | WWP | Email to associates; Respond to media inquiries |
| 5/15/2007 | 1.5 | DJC | Emails from attorney WWP regarding status [what could possibly be not known about the status by this time] |
| 5/16/2007 | 9.5 | WWP | Multiple email to from and to and TCW associate attorneys; respond to media inquiries [a whole day plus of unknown busywork] |
| 5/16/2007 | 0.3 | DJC | Emails to co-counsel |
| 5/17/2007 | 10.5 | WWP | Multiple email to associates [who are these associates]; TCW regarding same and LF associate; Respond to media inquiries |

Finally, on May 18, the briefing process began for the preliminary injunction. On this day, a total of 21 hours were spent on the briefing by both attorneys followed by many more days of briefing preparation.

\\\\\

1   The above example is not an isolated one within the time sheets as a whole.  The

2   thousands of dollars expended in conferencing, when one is asking the other side to pay, are not

3   justifiable.  Significant cuts would be warranted throughout this stage.

4   This stage also involved the interim fees motion (denied by the district court, and

5   later awarded on appeal).  The court's most precise estimate (estimates are only possible due to

6   block billing) is that 276 hours were expended on this motion.  This would equate to $124,200 at

7   plaintiffs' requested hourly rate of $450.00 – this just to generate a fees motion.  Again, using the

8   one attorney analogy, an attorney working on nothing else but the interim fees motion for 8 hours

9   a day, 5 days a week, would expend 7 weeks of time on this one motion's preparation for

10  hearing.  The time spent is excessive, albeit not as excessive as previous discrete activities.

11  However, the matter is complicated by the fact that Culhane hours are not

12  countable in this stage as the work was performed at the district court level.  As was done in the

13  previous district court stage where Mr. Culhane was involved, deletion of his hours approximates

14  the surplus time which would be deleted as a whole by the court in any event.[18]  Culhane hours in

15  this stage totaled 369.9.  Total hours counted for Palmer attorney time (including miscellaneous

16  matters) amount to (835.9-369.9) 466 hours.  Boydston will receive 12.1 hours.

17  Total – Stage VII (Palmer) (attorneys' fees)– $156,110.00

18  Cumulative Total (Palmer/Culhane) (attorneys' fees) – $1,196,234.70

19  Boydston Stage VII – $4,053.50

20  Boydston cumulative (and final) subtotal – $47,670.50

21  Paralegal fees – $1,351.00

22  Stage VIII (Third Appeal)

23  As is known by the parties, this stage involved review of the dissolution of the

24  preliminary injunction and the failure to award interim attorneys' fees.  Plaintiffs have correctly

25

26  [18]  This deletion also serves the purposes of excising "media relations" time, a substantial
expenditure in this stage.

not billed regarding the specific issue on which they did not prevail (dissolution), but nevertheless, accumulated 484.6 hours on the remaining issue.  This amount of time approximately doubles the time for preparing the entire motion from scratch, and which the court found already excessive.  This total amount of time cannot be sustained under any notion of appellate practice.  The issue on appeal was, of course,  strictly legal.  Although there was disagreement on the awardability of interim fees among the Article Three judges involved (3-1), formulating the legal issues were not difficult, and had already been done to a great extent in the district court.

A reasonable attorney would not have spent more time on the appeal on this issue than in preparing the motion as a whole.  Even giving plaintiffs the benefit of great doubt that 276 hours were appropriate at the district court level, plaintiffs cannot reasonably contend that more is required here.  The court will award only 276 attorney hours.

Total Stage VIII attorneys' (Palmer and Culhane) fees – $92,460.00

Cumulative (Palmer/Culhane attorneys') fees – $1,288,694.70

Stage VIII Paralegal Fees awarded (91 hours x $70/hr) – $6,370.00

Cumulative Paralegal fees – $7,721.00

Stage IX (on remand, issue of interim fees only)

After the Ninth Circuit determined that interim attorneys' fees should be awarded, the district court undertook immediately to effectuate that ruling.  The Honorable William B. Shubb commenced proceedings regarding the issue of attorneys' fees, and decided to refer it to the undersigned on June 16, 2008.  On June 27, 2008, the undesigned asked for status reports which were filed on July 8 and 11, 2008.  On July 22, 2008, a scheduling order was issued which in part required further initial filings by plaintiffs, and set forth a discovery schedule, if defendants opted for some discovery.  On August 12, 2008, the district court received the mandate of the Ninth Circuit to commence what had already been commenced in respect to deciding interim attorneys' fees.

Defendants opted to perform one set of paper discovery.  The final motion concerning that discovery was held on November 12, 2008, and resolved that day as well (written memorandum issued November 19, 2008).  The parties were tasked with filing final papers on the merits in December of 2008; because of perceived additions of new material in plaintiffs' papers, the last filing on the merits occurred on  January 5, 2009.

Plaintiffs' counsel desire 504.7 hours for preparing the supplemental papers regarding interim attorneys' fees.  As the record demonstrates, plaintiffs' counsel had fully prepared an interim attorneys' fees motion in the district court proceedings, Stage VII.  The discovery in this stage was minimal; the pleadings filed on the merits were supplemental.  The undersigned simply cannot justify the number of hours expended on a supplemental filing.

However, as with other district court stages, the Culhane hours (202.5) constitute approximately 40% of the hours requested.  They will be deducted in lieu of the same deduction which would have been made for excessive time billed for a total of 302.2.

Total Stage IX (Palmer attorneys') fees – $101,237.00

Cumulative and Final Total Palmer/Culhane – $1, 389,931.70 (One Million, Three Hundred and Eighty-Nine Thousand, Nine Hundred and Thirty-One Dollars and Seventy Cents.

Stage IX Paralegal Fees – (72.4 x $70) $5,068.00

Cumulative and Final Total Paralegal Fees – $12,789.00

**Conclusion/Summary for Monetary Amounts Related to Reasonable Hours**

Palmer/Culhane Attorneys" Fees – **$1,389,931.70**

Boydston Attorneys' Fees – **$47,670.50**

Paralegal Fees – **$12,789.00**

\\\\\
\\\\\
\\\\\

42

1    E.  Enhancement –

2         Plaintiffs seek an enhancement, or multiplier, of 60% based  primarily on

3    assertions of extraordinary success, but also on the basis of delayed attorneys' fees.[19]

4         The lodestar amount is presumptively the reasonable fee amount, and thus a
     multiplier may be used to adjust the lodestar amount upward or downward only in

5         " 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the
     record and detailed findings by the lower courts" that the lodestar amount is

6         unreasonably low or unreasonably high. See Pennsylvania v. Delaware Valley
     Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d

7         439 (1986) (quoting Blum, 465 U.S. at 898-901, 104 S.Ct. 1541); Blum, 465 U.S.
     at 897, 104 S.Ct. 1541; D'Emanuele, 904 F.2d at 1384, 1386; Cunningham v.

8         County of Los Angeles, 879 F.2d 481, 487 (9th Cir.1988).

9    Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000).

10         Enhancements for delayed payments are not permitted if the court uses current

11   rates for calculation of attorneys' fees.  In re Washington Pub. Power Supply Sys. Sec. Litig., 19

12   F.3d 1291, 1305 (9th Cir. 1994).  Because the court has made its calculation of the hourly rate at

13   the appropriate, current hourly rate, no enhancement may be given.  Moreover, no multiplier may

14   be based on novelty or complexity as this is subsumed within the lodestar.  Kelly v. City of

15   Oakland, 198 F.3d 779, 786 (9th Cir. 1999) citing Stewart v. Gates, 987 F.2d 1450, 1453 (9th

16   Cir. 1993).

17         That leaves plaintiffs' argument based on exceptional success or  "extraordinary

18   result."  To say that one has been nearly fully successful thus far does not necessarily equate with

19   extraordinary success.  The undersigned finds that in this case, at this juncture, an award of an

20   enhancement (multiplier) would be inappropriate.

21         There is no doubt that plaintiffs have received irreversible relief, i.e., the

22   Legislature modified the previous escheat statute.  Thus, there is no chance here of the

23

24         [19]  Plaintiffs sought an enhancement in their initial motion for interim attorneys' fees on
     additional grounds.  However, after defendants filed their December 5, 2008 opposition,

25   plaintiffs argue in their reply (December 12, 2008) only the two grounds set forth above.  In any
     event, for the reasons set forth by defendants, the court would not enhance fees based on the

26   seemingly abandoned grounds.

"extraordinary" if it is deemed so, becoming ordinary.  However, the undersigned does not find

the undoubtedly hard fought interim success extraordinary.  Previous to this litigation, California

did have procedures in place, albeit defective, to notify persons of potentially escheatable

property.  This litigation thus far has improved the notice portions of the statute to require notice,

if possible, before transfer of property to the state (instead of just before sale of the property by

the state), and it has improved the breadth of that notice.  As pointed out by defendants, plaintiffs

sought more extensive relief at the preliminary injunction stage than was granted.

More importantly, as noted by the Ninth Circuit, the award of interim fees is the

exception, rather than the rule.  Awarding an enhancement of the already exceptional interim

award does not seem appropriate.  Moreover, this is one area in which the judgment of

"exceptional" or "extraordinary" result should await, as defendants argue, a final ruling based on

a final result, and should not be prematurely judged.  In light of the final award, the notification

improvements of the new statute may not seem all that large.[20]

Finally, based on what has transpired in this case thus far, the undersigned does

not find the calculated lodestar to be unreasonably low.  Van Gerwen, supra.

F. Expenses

Plaintiffs request $49,153.12 reimbursement for expenses.  Supplemental Palmer

Declaration at page 86.  Defendants have objected to a number of highly improper requests for

expense reimbursement based on receipts provided by plaintiffs' counsel during discovery.  See

Opposition at 31-38.  Ball Declaration, Docket 198 at Exhibit 8.  Plaintiffs do not really attempt

to justify the objected-to expenses, but rely on an attack on the asserted flyspecking by opposition

counsel.  Defendants' objections, in the main, are well taken.  Indeed, the inappropriate attempt

---

[20]  Plaintiffs argue that they have "vindicated the rights of several million individuals and
have prevented violations of untold millions of individuals in the future under color of the UPL."
The precise proof of that statement is yet to come.  Many individuals may have received notice
under the old law, but chose to do nothing.  Many of the individuals affected by improper notice
in the past may only have been affected in a de minimis manner.   Plaintiffs may yet prove that
their result is extraordinary, but such boasts are premature at present.

to have defendants pay for certain expenses is illustrative of the excessiveness of the fees/expense motion as a whole.  For the following reasons, the foregoing expenses are disallowed in the amount shown.

Airline Tickets  – Out of a total request of $7,518.40, plaintiffs supply only $2,376.19 in receipts. **$5,142.21 will be deducted.**  Perhaps some of the England trip is included in the undocumented amount.  In addition, Mr. Palmer sought to have his wife's trip to the Ninth Circuit argument in Seattle charged to defendants.  A further **$320.60** will be deducted.  Defendants object to Culhane invoices based on the argument that he was not authorized to practice in the Eastern District.  Based on the previous analysis, including the finding that Culhane was authorized to practice in the Ninth Circuit, and the lack of specificity in the objection, it is overruled. Defendants' objections to other airline travel found on page 32 of the Opposition, as unrelated to the case warrant further reductions in the amounts of **$203.50, $148.30,** and **$573.80.**  Total airline deductions are **$6, 388.41** which then makes only *$1,129.99* allowable.

Hotel – Of their total request for $5,580 in hotel expenses, plaintiffs have submitted receipts for only $3,895.97 of that amount.  Therefore, $1,684.03 will be deducted.  Also to be deducted are three extra room nights in Seattle that were not the night before or the night of oral argument in Taylor II, for a deduction for Palmer in the amount of $461.24 (hotel night plus room tax) times three nights for a total of $1,383.72 in deductions for Palmer.  Ball Decl., Docket 198-10 at 1102. Culhane's hotel stay for two nights will not be deducted as he was authorized to practice in the Ninth Circuit.  Culhane will not be permitted hotel expenses for a stay in San Jose on August 9, 2007 in the amount of $233.69 as nothing occurred in this case on that date in San Jose.  Ball Decl., Docket 198-9 at 998.  Nor will plaintiffs be permitted to recover for in room movies in the amount of $44.57.  Id. at 1102-03.  The total hotel disallowed amount is **$3,346.01** which makes only $2,233.99 allowable.

Gas Expenses – Plaintiffs have submitted receipts totaling $359.99 but seek only $287.22 for these expenses.  None of the fill-ups took place on dates when time was billed on this case.  Ball

1   Decl., Docket 198-9 at 997, 998, 1039, 1043, 1069; Docket198-10 at 1086, 1113, 1117.  To the

2   extent that two fill-ups occurred on dates that briefs were filed, plaintiffs will not be compensated

3   as they could have filed their papers in a more cost effective manner.  Ball Decl., Docket 198-9 at

4   997, 998, 1056; Docket 198-10 at 1082, 1083.  Therefore, none of the **$287.22** in these expenses

5   will be allowed.

6   Car Rental – Plaintiffs request costs for $420.44, but certain rental dates will be disallowed

7   because no time was billed for this case on March 13, 2007 or August 13, 2003.  Ball Decl.,

8   Docket 198-9 at 998, 1040.  Therefore, costs for rentals for those dates will be deducted.  Of the

9   remaining amount, $250.40, for Culhane's rental in Seattle on August 4, 2006, half or $125.20

10  will be permitted as part of the hearing in Taylor II, as a car rental for four days after the July 31,

11  2006 hearing is not warranted.  This amount will be the total amount allowed for this category.

12  Accordingly, the difference between $420.44 and $125.20, or **$295.24**, will be disallowed.

13  Mileage – Plaintiffs seek $2,499.81 in expenses for 2,863.2 miles through handwritten notes

14  alone.  First, as pointed out by defendants, if plaintiffs are compensated at a rate of 58.5 cents per

15  mile, their requested mileage would amount to $1,674.97.  As most of the claimed expenses are

16  either on dates for which no time was billed for this case, for travel to the courthouse to

17  personally file briefs when they could have been filed in a less expensive manner, for meetings

18  with defense counsel on other cases as documented by defense counsel's billing records, or for

19  which there is no evidence that the mileage was for this particular case, they will not be allowed.

20  Ball Decl., Docket 198-9 at 1005, 1056, 1039, 1043, 1038, 1041, 1075; Docket 198-10 at 1082,

21  1083, 1085, 1092, 1114, 1130, 1144, 1158.  Therefore, plaintiffs will be compensated only for

22  296.5 miles for the purposes of argument in court in connection with Taylor II.  At an I.R.S. rate

23  of 58.5 cents per mile, plaintiffs will be allowed $ 173.45.  Of the requested amount, **$2,326.36** is

24  disallowed.

25  Parking – Plaintiffs request $386 in parking expenses, and have submitted receipts totaling

26  $421.50.  Plaintiffs will not be awarded expenses for filing documents in court rather than filing

in a less expensive manner, parking in Southern California as no events occurred there, parking at the courthouse and taking a cab to the same courthouse at the same time, field trip, parking in relation to appeal in Taylor III where Ninth Circuit ruled that each side should bear own costs on that appeal. Ball Decl., Docket 198-9 at 1014, 1056, 1069, 1042, 1050, 1052; Docket 198-10 at 1115, 1125. Parking for Culhane during Ninth Circuit arguments will be permitted; however, for half of the five day period only. Id. at 198-9, pp. 997-98. Therefore, of the $386 requested, plaintiffs will be awarded $113.20, an amount to which defendants do not object, as well as $45 for Culhane's parking (half of $54 plus $18), for a total of $158.20. Consequently, **$227.80** is disallowed.

Cab Expenses – Plaintiff have provided receipts supporting $140 of their requested $353.82 in cab expenses. Plaintiffs will be awarded $140 as this amount is supported and not objected to by defendants. Ball Decl., Docket 198-9 at 1049, 1051; Docket 198-10 at 1094, 1098. Therefore, **$213.82** is disallowed.

Bridge Tolls – Plaintiffs request $116.50 but provide $30 in receipts. Defendants do not object. Therefore, plaintiffs are permitted $30 in these costs, and **$86.50** is disallowed.

Meals and Drinks – Of the $1,732.67 requested for meals, plaintiffs have submitted receipts for $1,716.60. Of that amount, defendants state that $435 of it was for alcohol. Defendants point to numerous examples of lavish expenditures, not just for counsel but for at least one companion. Defendants also point to similarly lavish expenditures for Mini Bar, as well as food expenses in locations apparently unrelated to this case. Defendants suggest a per diem amount to be awarded based on the federal government standard meal allowance of $64 per day, (www.gsa.gov) and that only meal expenses incurred in a 1.5 day period during each of the Taylor I and Taylor II arguments in San Francisco and Seattle be permitted, for a total of $192. Defendants' points are well taken and supported by the record. Ball Decl., Docket 198-9 at 1049; Docket 198-10 at

1095, 1096, 1097, 1099, 1107, 1109, 1115, 1117.[21]  Therefore, plaintiffs will be awarded $192 and **$1,540.67** is disallowed.

Postage – Plaintiffs seek $300.72 in postage expenses, but have submitted receipts for only $68.53.  Defendants do not object to this amount.  Therefore, $68.53 is allowed, and **$232.19** is disallowed.

Federal Express – Although requesting $508.86 in Fed Ex expenses, plaintiffs have provided receipts for $539.19.  Defendants object to all but $130.46, claiming that the remaining amounts either were not related to Taylor I or Taylor II, or that plaintiffs have not shown the necessity to use this method of delivery instead of the less expensive regular mail or email.  The record supports these objections.  Ball Decl., Docket 198-9 at 1012-15, 1017-20, 1023, 1026, 1030, 1057-59, 1076-77; Docket 198-10 at 1129, 1136, 1139, 1141-42, 1147, 1159-60.  Therefore, **$378.40** will be disallowed.

Fax Expenses – With only a handwritten note to add $5,485 for faxes in support of plaintiffs' request for $14,091 in fax expenses, this request cannot be considered.  Ball Decl., Docket 198-9 at 998.  Moreover, there is little justification for faxing documents at great cost when cheaper e-mail with attachment is available.  Finally, there is no breakdown of the actual cost of faxing, the charge seems entirely arbitrary, i.e., are there any additional telephone charges, or does a plan take this into account, and the like.  A fax machine should not be a profit center.  Finally, at sometime, these office expenses are simply the office overhead, like the lights and internet service, which is encompassed by the attorneys' hourly rate.  Therefore, all of the requested expenses in the amount of **$14,091** are disallowed.

Copying Costs – Plaintiffs request $7,905.63 for copying costs, and provide receipts for $5,268.54 of this amount.  Defendants object to the majority of this amount as improper because it either relates to Taylor III for which the parties had to bear their own costs, because there is

---

[21]  Many of these meal orders indicate they were made by Joanne Palmer.

insufficient information to link the receipt to this case and the dates do not correspond to dates for which work was done that would require photocopying, or because they are related to the appeal in Taylor II where defendants have already paid the permitted amounts.  <u>See</u> e.g. Ball Decl., Docket 198-9 at 1002, 1014, ; Docket 198-10 at 1122-24, 1127.  Accordingly, plaintiffs will be permitted costs in the amount of $524.45 as this amount is not objected to by defendants and is supported by adequate documentation.  **$7,381.18** will be disallowed.

<u>Courier Fees</u> – Plaintiffs request $332.39 in such fees, but have provided no receipts.  This request is denied in the full amount of **$332.39**.

<u>Transmission of Record</u> – The requested amount for this category is $165.60; however, plaintiffs have again provided no receipts.  This request is denied in full in the amount of **$165.60**.

<u>Court Reporter Fee</u> – Plaintiffs request $330.41 and have provided receipts for the full request. Defendants do not object.  This amount is allowed in full.

<u>Filing Fees</u> – Plaintiffs request $910 and have provided receipts in the amount of $965. Defendants do not object to the amount of $965.  Therefore, this amount will be permitted.

<u>Computer Fees</u> – Although plaintiffs have requested $550 in computer fees, they have submitted no receipts in support of this request.  Defendants contend that such costs are not permitted because there is no showing that this type of expense is ordinarily charged to a fee paying client. The request for **$550** is disallowed.

<u>LexisNexis Research</u> – Plaintiffs request $2,538.33 in legal research fees and submit receipts in support in the amount of $451.69.  The receipts submitted do not indicate that they were for this case, and do not contain sufficient information.  For example, some of the receipts are monthly statements from Lexis which cover one month periods and either do not specify a client or specify numerous clients.  Ball Decl., Docket 198-9 at 1074; 198-10 at1084, 1118.  It is unknown whether research was done for other cases during these months.  Therefore, **$2,538.33** will be disallowed.

\\\\\

49

1    Consultants – Plaintiffs request $2,625 in consultant fees to pay Daniel McKinley, apparently a

2    whistleblower.  Ball Decl., Docket 198-10 at 1093.  Aside from the fact that there is no authority

3    for such consultant fees, the court accepts defendants' representation that this consultant was not

4    used for the issues on which plaintiffs prevailed.  Therefore, **$2,625** in consulting fees is denied.

5    **Conclusion/Summary of Monetary Amounts Related to Expenses**

6            Expenses Allowed: $6,201.68

7            Expenses Disallowed: $43,006.12

8    ***Overall Conclusion***

9            "Every excess has its effect, its aftermath, its hangover.  Everything that exceeds

10   the bound of moderation has an unstable foundation." – Alfred Montapert

11           This interim fees motion has been brought on an unstable foundation due to the

12   excesses of hours asserted and expenses incurred.  The court, through expenditure of much

13   unrecompensed time, the "aftermath," has sought to base the final figures for the interim fees'

14   motion on a reasonable foundation.

15           IT IS HEREBY RECOMMENDED that the reasonable total of **$1,437,602.20**

16   attorneys' fees, **$12,789.00** in paralegal fees, and **$6,201.68** in expenses should be awarded.

17           These findings and recommendations are submitted to the United States District

18   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

19   after being served with these findings and recommendations, any party may file written

20   objections with the court and serve a copy on all parties.  Such a document should be captioned

21   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22   shall be served and filed within ten days after service of the objections.  The parties are advised

23   \\\\\

24   \\\\\

25   \\\\\

26   \\\\\

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: 02/23/09

/s/ Gregory G. Hollows

_____

U.S. MAGISTRATE JUDGE

taylor.fees